## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **Case No. 1:21-cr-00362 (APM)** |
| v. | : | |
| | : | |
| ANDREW MICHAEL CAVANAUGH, | : | |
| | : | |
| Defendant. | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Andrew Michael Cavanaugh to 30 days' incarceration, 24 months' probation and $500 restitution.

### I.      Introduction

The defendant, Andrew Michael Cavanaugh, a former United States Marine and tactical training instructor, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than $2.7 million in losses.[1]

On February 17, 2022, Cavanaugh pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G):  Parading, Demonstrating, or Picketing in the Capitol Building. As explained

---

[1]      As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

herein, a sentence of thirty days' incarceration, with probation to follow, is appropriate in this case because: (1) Cavanaugh entered and remained inside the Capitol building for over 30 minutes; (2) having worked embassy security as a Marine, Cavanaugh recognized a security perimeter, and that police officers were deploying nonlethal crowd suppression techniques in an effort to get the crowd to disperse, but he remained on the grounds and later proceeded into the broken-in building; (3) Cavanaugh blamed the violence inside the Capitol and on Capitol grounds on security failures by Capitol Police and has yet to express any personal responsibility for his part in the riot.

The Court must also consider that Cavanaugh's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings.  But for Cavanaugh's actions alongside so many others, the riot likely would have failed.  *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers.  The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).  Cavanaugh's participation in a riot that actually succeeded in halting the Congressional certification, combined with Cavanaugh's knowing disregard for police's efforts to prevent rioters from entering the building and lack of remorse, demonstrate that a sentence more significant than probation is warranted here. A sentence of incarceration is both necessary and appropriate in this case.

## II.     Factual and Procedural Background

### *The January 6, 2021, Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 21 (Statement of Offense), at 1-7.  As this Court knows, a riot cannot occur

without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day.

*Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol Grounds*

Assaults against law enforcement on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible. Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the United States Capitol Police's ("USCP") defenses until the building itself was accessible and the occupants were at risk. The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



*Exhibit 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling throughout the grounds. At approximately 12:45 p.m., a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway. Seeing this, a half dozen USCP officers began to gather behind what is labeled in Government's Exhibit 1 as "1st Police Barricade," circled in red and marked as Area A. At 12:52 p.m., the first breach of the outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted

4

area to engage with USCP officers at the first manned barrier.  Less than a minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob.  By 12:58, the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Government's Exhibit 1.  They flooded the area labeled "Lower West Plaza" Area C on Government's Exhibit 1, pushing against the barricade there.



*Exhibit 2: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza.  For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and

reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.



*Exhibit 3: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left).  In the photo of the nearly completed bicycle rack barrier line as of 1:39 p.m., a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 p.m., the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol.  At 2:03 p.m., Metropolitan Police Department officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd.  It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b).  All people must leave the area immediately.  This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left.  On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles.  Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves.  By 2:28 p.m., with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called.  With their defensive lines extinguished, several police officers were surrounded by the crowd.  The rioters had seized control of the West Plaza and the inauguration stage.  There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 p.m. to build to a torrent.







*Exhibit 4: Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

*Andrew Cavanaugh's Role in the January 6, 2021, Attack on the Capitol*

On January 4, 2021, Andrew Cavanaugh traveled by himself to Washington, D.C., from his home near Bozeman, Montana, to attend the "Stop the Steal" rally.  On January 6, Cavanaugh spent time near the Lincoln Memorial earlier in the day and approached the Washington Monument for President Trump's speech, but it was too hard for him to hear.  Cavanaugh met up with a friend from the Marine Corps and met a group of other people whom he described as "Christians," and with whom he went to the Capitol grounds.

According to Cavanaugh's post-arrest interview, the security perimeter around the Capitol grounds was still intact when he arrived.  But within an hour, the perimeter had broken and people were flooding across the lawn.  Cavanaugh saw people in combat gear and was present when police deploying nonlethal force, which he knew meant that the police were trying to get people to leave the area.  Cavanaugh saw the police deploy CS gas.[2]  Nonetheless, after treating some rioters who had sustained injuries, including a rioter whose face had been burned by CS gas,[3] Cavanaugh and a friend (also a former Marine) proceeded toward the Capitol and headed up the stairs toward the Upper West Terrace on the Senate side.  At some point, Cavanaugh was separated from his friend.

Cavanaugh entered the U.S. Capitol building at 2:23p.m. through the Senate Wing Door, approximately ten minutes after the first breach of the building, which occurred at that location. Cavanaugh can be seen on Capitol CCTV excitedly fist pumping as he walks inside:

---

[2]     CS gas—which is what Cavanaugh believed was being sprayed—is a chemical irritant commonly known as "tear gas."

[3]     This information comes from Cavanaugh's post-arrest interview. The government has not located any evidence supporting this claim but does not dispute it.





*Exhibits 5A and 5B – Cavanaugh, circled in red, raising his fist in the air as he enters the Capitol building*

Cavanaugh walked through the Capitol Crypt moments after rioters overran a line of police there trying to prevent rioters from moving further into the building. Cavanaugh proceeded up the stairs to the Capitol Rotunda, where he remained for approximately 10 minutes, watching rioters fill the

Rotunda and casually mill about, uninhibited.  He exited the building at approximately 2:56 p.m. by climbing out a window near the Senate Wing Door.

In total, Cavanaugh spent nearly 33 minutes inside of the Capitol.  Cavanaugh knew at the time he entered the U.S. Capitol Building that he should not have done so yet he remained in the building for over a half an hour.  As later described by Cavanaugh, it was chaotic inside the Capitol, and he observed rioters fist fighting each other and breaking a podium near the Senate Wing Door. Although Cavanaugh claims that he tried to leave quickly,[4] that urgency is not borne out by CCTV footage.  The CCTV footage shows Cavanaugh lingering at the Memorial Door near the Crypt and in the Rotunda.  Although there are 5-10 minute breaks in the CCTV footage, and it is unclear what Cavanaugh was doing during these lengthy periods when he cannot be seen on camera, the footage that does exist does not support the contention that Cavanaugh attempted to proceed quickly through the Capitol building to find an exit.

*Andrew Cavanaugh's Interview*

Cavanaugh voluntarily agreed to an interview with the FBI at the time of his arrest.  During the interview, Cavanaugh admitted that he entered the Capitol on January 6, 2021, and that he knew in advance that Congress was certifying the results of the 2020 Presidential Election that day.  Cavanaugh said he saw people on the grounds and inside the building who were "kitted up" in what looked like combat gear.  He described these people as "agitators," or "Antifa."  According to Cavanaugh, he did not believe that those who were riling up the crowd and inciting violence were Trump supporters.  Cavanaugh admitted that he was at the West Front when police deployed

---

[4]     Cavanaugh's Statement of Offense states that Cavanaugh "knew he should not have gone inside [the Capitol building] and tried to exit quickly," which is consistent with Cavanaugh's own statements in his post-arrest interview.  However, the government identified Cavanaugh in additional CCTV footage after the date of his plea which shows the latter half of Cavanaugh's time in the Capitol.

non-lethal crowd suppression techniques, which—based on his background as a security officer in the United States Marine Corps—he recognized were "meant to get you [protestors] to go away." Cavanaugh said that while on the Capitol grounds, he was with a group of people that he had not known previously, and when police started deploying CS gas and flash bangs, the group looked to him because of his experience and asked him what to do.  According to Cavanaugh, he told them, "Not a fucking thing," because he knew that police would escalate reciprocally to any escalation by the crowd.  Cavanaugh also claimed that he told people not to bring weapons onto the grounds because he knew what kind of security the Capitol had and that people were likely to be identified if they committed unlawful conduct.

Cavanaugh told the FBI agents that while on the Capitol grounds he was with a friend from the Marine Corps who had an IFAK (Individual First Aid Kit).  Cavanaugh said that he had recently refreshed his IFAK training and viewed himself as being in a position to help.  He said that he and his friend treated a rioter whose face had been burned by CS gas.  Cavanaugh claimed that he initially entered the Capitol building to help people—which he characterized as his "whole purpose for being there"—but that, once inside, it was "chaotic" and he realized that he "was in way over [his] head."  Cavanaugh saw evidence of CS gas on the floor of the Capitol building, and later, he saw rioters fist fighting each other and breaking a podium near the Senate Wing Door.  Cavanaugh reported being separated from his friend with the IFAK sometime before he entered the Capitol building.  He stated that, during the time he spent in the Capitol building, he was looking for his friend and/or a way out.  He admitted that he stayed inside "longer than [he] needed to be to find" his friend.  Later in the interview, he said that he found out his friend barely went inside the building before turning around and leaving.

Cavanaugh repeatedly claimed to have done nothing wrong.  Cavanaugh stated that later, after the events of January 6, "everyone was like, 'tell me you weren't part of that!'  It's like, well, no, I mean I really wasn't.  I did go in, but I really was not a part of what was happening there that day."  Cavanaugh drew a distinction between those he characterized as "Trump supporters," who were there to lawfully protest, and "agitators," who incited violence.

Cavanaugh also blamed the violence on errors made by Capitol Police.  Cavanaugh leaned heavily on his background as a security officer in the Marines, commenting throughout the conversation on how Capitol police handled the events of January 6.  Cavanaugh said police failed to properly deescalate outside and that Capitol Police leadership made strategic errors that caused the building to be overrun.  He said police exhibited failures of "training," and called them "completely useless."  Referring to events he had seen while deployed Iraq and Afghanistan, Cavanaugh claimed that what happened at the Capitol was not an insurrection: "When I think of an insurrection I think of like an armed takeover and that's not what I saw there … It was violent because people did die, but that wasn't the crowd, that was the police that fuckin' shot [Ashli Babbitt]."  He also blamed mainstream media for not reporting on the shortcomings of Capitol Police.

Cavanaugh told the FBI that he had debated whether to turn himself in:  "I thought that maybe that I could offer my insight, but then I didn't want to look at 20 federal charges for trying to help.  'Cause that's what I went there for and that backfired in my face times ten."  He said he lost sleep prior to his arrest worrying about the FBI coming to his door.

*The Charges and Plea Agreement*

On May 14, 2021, Andrew Cavanaugh was charged by four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  On February

17, 2022, Cavanaugh pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), parading, picketing, or demonstrating in the Capitol Building.  By plea agreement, Cavanaugh agreed to pay $500 in restitution to the Department of the Treasury.

### III.     Statutory Penalties

Cavanaugh now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G).  As noted by the plea agreement and the U.S. Probation Office, Cavanaugh faces up to six months of imprisonment and a fine of up to $5,000. Cavanaugh must also pay restitution under the terms of his plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6).  In this case, as described below, the Section 3553(a) factors weigh in favor of incarceration.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history.  It represented a grave threat to our democratic norms; indeed, it was the one of

the only times in our history when the building was literally occupied by hostile participants.  By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances.  As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob.  Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air.  No rioter was a mere tourist that day.

Additionally, while looking at each defendant's individual conduct, we must assess such conduct on a spectrum.  This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition.  While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Cavanaugh personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct.  The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor

cases, nor does it meaningfully distinguish Cavanaugh from most other misdemeanor defendants. Cavanaugh's lack of violence and property destruction is the only reason he was charged only with, and permitted to plead to, a misdemeanor rather than felony.

Cavanaugh entered the U.S. Capitol building relatively early—through the Senate Wing Door (the initial breach point), approximately ten minutes after the very first rioter entered the building through a nearby broken window.  He also was present on the West Front while police battled rioters and used crowd-suppression techniques and dispersal orders to try to prevent the crowd from getting into the building.  But he went into the building anyway.  Though Cavanaugh did not encourage destruction of property or violence, he went into the Capitol building after observing violence and failed crowd-control measures, and he did not attempt to stop any violence. And he lingered in the Capitol building for more than a half an hour.  Even if he passively observed the chaos without directly engaging in violent acts, he knew he should not have gone inside and his presence alone contributed to the chaos.

Moreover, Cavanaugh has not demonstrated sincere remorse or contrition, as reflected in his post-arrest interview with the FBI.  Cavanaugh repeatedly attempted to minimize his conduct and place blame on others, even going so far as to assert that the violence at the Capitol was the fault of the Capitol Police.  Cavanaugh's self-serving claims lack credibility and indicate that he does not appreciate the severity of his conduct and the conduct of others on January 6.  According to Cavanaugh, for example, his "whole purpose" for going inside the Capitol was to help others, but Cavanaugh's on-camera conduct contradicts his contention that, as he put it, he was just there to help.  He entered the Capitol pumping his fist, clearly excited to be inside, and the available footage does not show him providing aid to anyone.  Cavanaugh claimed that he went inside the Capitol looking for his friend, but—according to Cavanaugh—his friend reached the threshold,

saw what was going on inside, and promptly turned around.  Cavanaugh did the opposite: he saw the chaotic scene, he saw that CS gas had been deployed, and yet he chose to go inside the Capital and stay inside for over half an hour.  Similarly, Cavanaugh claimed that, outside the Capitol building, on the West Front, he told other people not to escalate.  But he did not heed his own advice.  Instead, *he ascended the stairs*, past the line of police officers that, as Cavanaugh knew, were trying to get the rioters to "go away."  Cavanaugh tried to portray himself as someone who was above the fray, "not a part of it."  Far from it: he actively and enthusiastically participated in breach of the Capitol on January 6.  Accordingly, the nature and the circumstances of this offense establish the clear need for a meaningful term of incarceration in this matter.

### B.  The History and Characteristics of Cavanaugh

As set forth in the PSR, Cavanaugh has no criminal history.  (PSR ¶¶25-31.)  Cavanaugh served with distinction in the United States Marine Corps from 2003 until 2011, including a stint in Iraq where he saw active combat, and he was honorably discharged after receiving a diagnosis of post-traumatic stress disorder.  Cavanaugh has since been a business owner and a civilian tactical training instructor.  Cavanaugh appears to be financially stable and has been compliant with his conditions of pre-trial release.

While Cavanaugh's military service is laudable, it renders his conduct on January 6 all the more troubling.  As a former Marine security guard of U.S. Embassies, Cavanaugh was well aware of the great jeopardy posed by violent entry into a secure government building *and* he was aware of the violence required to breach a secure government building such as the Capitol.  His blatant decision to breach a security perimeter and enter a secure government building with a crowd of uncontrollable size is nothing short of shocking in light of his service and training.  In this case, Cavanaugh's former military service makes his conduct on January 6 more egregious and

demonstrates a very real need for a sentence that reflects the seriousness of the offense, promotes respect for law, and affords deterrence.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[5]  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation.  I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant.  18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most

---

[5]      Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

compelling reason to impose a sentence of incarceration.  For the violence at the Capitol on

January 6 was cultivated to interfere, and did interfere, with one of the most important democratic

processes we have: the peaceful transfer of power to a newly elected President.  As noted by Judge

Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to
> attack the Capitol to prevent our elected officials from both parties from performing
> their constitutional and statutory duty, democracy is in trouble. The damage that
> [Cavanaugh] and others caused that day goes way beyond the several-hour delay in
> the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven

months ago for the United States and our diplomats to convince other nations to pursue democracy.

It means that it will be harder for all of us to convince our children and our grandchildren that

democracy stands as the immutable foundation of this nation."  *Id.* at 70; *see United States v.*

*Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have

recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a

manner that delays the certification of the election, throws our entire system of government into

disarray, and it undermines the stability of our society.  Future would-be rioters must be deterred.")

(statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence.  This was not a protest.  *See United*

*States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can

be made defending what happened in the Capitol on January 6th as the exercise of First

Amendment rights.") (statement of Judge Moss).  And it is important to convey to future potential

rioters—especially those who intend to improperly influence the democratic process—that their

actions will have consequences.  There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Cavanaugh's attempts to downplay the seriousness of his conduct, his efforts to blame others, and his failure to recognize the gravity of his conduct, let alone display remorse, demonstrate a strong need for specific deterrence.  Cavanaugh has never expressed meaningful remorse or acknowledged personal responsibility for being part of the crowd that shut down the United States government on January 6.  To the contrary, he denied that the crowd, or at least "Trump supporters," were involved in violence, claiming that that any violence on January 6 was the fault of "antifa," or the Capitol Police—the very officers who were attempting to protect the Capitol, members of Congress, and themselves—whose efforts Cavanaugh helped to thwart.  Even assuming Cavanaugh's statements reflect his genuinely held beliefs, they are divorced from the evidence and reflect an inability to understand the nature and seriousness of his conduct. Cavanaugh was not, as he claimed, a neutral observer or an objective commentator on law enforcement's security failures that day.  Cavanaugh simply does not seem to recognize that, by entering and remaining in the Capitol building on January 6, *he* was preventing the joint session from reconvening.  *He* prevented law enforcement from regaining control of the building.  *He* enabled the violence simply by being a part of the crowd.  The fact that Cavanaugh blames the violence and destruction of January 6 on outside "agitators" and the police, themselves under attack, demonstrates that Cavanaugh does not fully grasp the reality of what happened during the siege of the Capitol building or his role in it.  A significant sentence is necessary to deter this defendant from engaging in similar conduct in the future.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as

in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[6] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind.   Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes.   A probationary sentence should not necessarily become the default.[7]   Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be."   *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

---

[6]     Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[7]     Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation:  *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF).   The government is abiding by its agreements in those cases, but has made no such agreement in this case.  *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

The government and the sentencing courts have drawn meaningful distinctions between offenders.  Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment.  Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration.  Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Cavanaugh has pleaded guilty to Count Four of the Information, charging him with parading, demonstrating, or picketing in a Capitol building, a violation of 40 U.S.C. § 5104(e)(2)(G).  This offense is a Class B misdemeanor.  18 U.S.C. § 3559.  Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9.  The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(6), do apply, however.

For one thing, although each of the defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or otherwise), whether she destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct," but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may consider the sentence imposed on Abrams Markofski, 21-cr-344 (JDB) for reference. Like Cavanaugh, Markofski entered the Capitol through the Senate Wing Door shortly after that door was breached (less than 5 minutes). Also, like Cavanaugh, Markofski entered the Capitol early despite recognizing red flags as a member of the Wisconsin National Guard. Markofski and his associate (Brandon Nelson, 21-cr-344) remained in the Capitol building for 80 minutes. The government considers time spent in the Capitol above 30 minutes to be aggravating, but 80 minutes is certainly more significant than 30. The balance of aggravating factors in Cavanaugh's case weighs more heavily in favor of incarceration than Markofski, however, given his specific experience in the Marines providing security to U.S. embassies. Not only did he recognize a security perimeter and crowd-suppression nonlethal force, Cavanaugh went so far as to blame those protecting the Capitol for failing to quell the violence in a crowd of uncontrollable size.

Another case the Court can consider is United States v. Thomas Vinson, 21-cr-00355 (RBW). Vinson—an oil-company employee with four years of service in the U.S. Air Force who had two operating-a-vehicle-under-the-influence convictions from 1992 and 1996—entered the

Capitol with his wife at the exact same location as Cavanaugh and Markofski, the Senate Wing Door, at approximately 2:18 p.m, a short time after the first breach.  He left the building about 32 minutes later.  Like Cavanaugh, he cooperated with the FBI by submitting to a voluntary interview. Vinson also witnessed at least two instances where rioters overwhelmed officers, one of which resulted in the brutal breach at the Rotunda Doors around 2:38 p.m.  The Court imposed a sentence of five years of probation (without home detention), a $5,000 fine, 120 hours of community service, and $500 restitution.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender."  *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).  "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.     The Court's Lawful Authority to Impose a Split Sentence

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense.  *See* 18 U.S.C. § 3561(a)(3); *see United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022)

(concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21-cr-630 (CJN), ECF 37 (D.D.C. April 22, 2022) (imposing split sentence); *United States v. Sarko*, 21-cr-591 (CKK), ECF 37 (D.D.C. April 29, 2022) (imposing split sentence); *United States v. Entrekin*, 21-cr-686 (FYP), ECF 34 (D.D.C. May 6, 2022) (imposing split sentence). In addition, for any defendant placed on probation, a sentencing court may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § 3563(b)(10).

### A. A sentence imposed for a petty offense may include both incarceration and probation.

#### 1. *Relevant Background*

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today.  *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing).  That legislation falls in Chapter 227 of Title 18, which covers "Sentences."  Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment").   Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[8] followed by a term of probation.

---

[8]     A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3563(b)(10).  *See* Part II *infra*.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences."  Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided."  18 U.S.C. § 3551(a).  Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D."  18 U.S.C. § 3551(b).[9] As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment."  *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation."  As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense."  Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3).  In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if Cavanaugh has been sentenced to a term of imprisonment at the same time for another such offense."  H.R. Rep. 102-405, at 167 (1991).  Instead, three years later Congress revised Section

---

[9]      Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence."  18 U.S.C. § 3551(b).

3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language.  *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report).  In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).

### 2. *Analysis*

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases.  *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).  In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583.  S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background.  But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight

imprisonment," consistent with the general rule in Section 3551(b).  *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless."  *Little*, 2022 WL 768685, at *4.  But that limitation "does not extend" to a defendant sentenced to a petty offense. *See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation.  *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam).  In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison.  *Id.* at 808.  In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation."  *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th

28

ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense"). Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense." *See Little*, 2022 WL 768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided

sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at \*89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one."). As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense. *Id.* This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented." *Little*, 2022 WL 768685, at \*8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329. Where a conflict exists "between a general provision and a specific one, whichever was enacted later might

be thought to prevail." *Id.* at 185.  "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Id.*  Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning.  When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence.  Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3).  *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense.  For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough.  *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted).  Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or

31

probation).  Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation).  No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense.  Cavanaugh pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine.  *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

### B. A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.

#### 1. Relevant background

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over

weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement"

such as "for a week or two."  *Id.*[10]

### A.  Analysis

A sentencing court may impose one or more intervals of imprisonment up to a year (or the

statutory maximum) as a condition of probation, so long as the imprisonment occurs during

"nights, weekends or other intervals of time."  18 U.S.C. § 3563(b)(10).  Although the statute does

not define an "interval of time," limited case law suggests that it should amount to a "brief period"

of no more than a "week or two" at a time.  *United States v. Mize*, No. 97-40059, 1998 WL 160862,

at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above

and reversing magistrate's sentence that included 30-day period of confinement as a condition of

probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18,

2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation

was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous

60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix

months is not the intermittent incarceration that this statute permits.").  Accordingly, a sentence of

up to two weeks' imprisonment served in one continuous term followed by a period of probation

is permissible under Section 3563(b)(10).[11]

---

[10]     Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation
was "not intended to carry forward the split sentence provided in Section 3561, by which the judge
imposes a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL
25404, at *98.

[11]     Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time"
does not imply that a defendant must serve multiple stints in prison.  Just as "words importing the
singular include and apply to several persons, parties, or things," "words importing the plural
include the singular."  1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation.   18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539.   Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic.   Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure. In any event, the government does not advocate a sentence that includes a imprisonment as a term of probation in Cavanaugh's case given the requested 30-day imprisonment sentence.

**VI.     Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors.  As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence.  Balancing these factors, the government recommends that this Court sentence Andrew Cavanaugh to30 days' incarceration, 24 months' probation, and $500 in restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By: _____
Kathryn E. Fifield
Trial Attorney
U.S. Department of Justice, Criminal Division
Detailed to the D.C. U.S. Attorney's Office
601 D Street, N.W.
Washington, D.C.  20530
(202) 320-0048
Kathryn.fifield@usdoj.gov